**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES** | : | |
| | : | |
| **v.** | : | **Case No. ABA-24-310** |
| | : | |
| **MICHAEL SAM TEEKAYE, JR.,** | : | **FILED UNDER SEAL** |
| | : | |
| **Defendant.** | : | |

## SENTENCING MEMORANDUM

1

**Exhibit List**

Exhibit A – RICA assessment

Exhibit B – Howard County Public School System psychological assessment

Exhibit C – Howard County Public School System records

Exhibit D – RAISE records

Exhibit E – UMMC record from September 21, 2018

Exhibit F – AoMRC report

Exhibit G – Report of Dr. Scott Bender

Exhibit H – PIW psychological evaluation

Exhibit I – Letter from ████ Teekaye

Exhibit J – Letter from ███ Teekaye

Exhibit K – RICA records

Exhibit L – Brief from Dr. Jennifer Woolard

Exhibit M – Letter from Michael Teekaye Jr.

Exhibit N – Letter from ████ Teekaye

Exhibit O – Affidavit from Dr. Andrea Brockman

Exhibit P – Affidavit from Jack Donson

Exhibit Q – Reentry plan

Michael S. Teekaye, Jr. is the 23-year-old son of Liberian refugees who twice fled the country during a brutal civil war that ravaged the small West African nation throughout the 1990s. Seeking asylum in the United States from extreme violence in Liberia and persecution in West Africa, Michael's parents settled in Howard County, Maryland to build a life and family.

Michael was born in 2003. Although he was a quiet kid, he enjoyed playing tag and hide and seek with kids from his neighborhood, and he joined a little league football team when he was just five or six years old. By that point, Michael's learning difficulties were already apparent to his teachers. He had to repeat kindergarten, and, in the first grade, his school's IEP team recommended that he undergo educational, psychological, and speech/language assessments. Michael's parents refused those assessments – a position they'd repeat five years later when an IEP team again recommended special education testing due to growing concerns about Michael's academic performance and social/emotional functioning.

By middle school, Michael began worrying that people and objects could read his thoughts. Michael withdrew further from his parents and peers. After experiencing ongoing paranoia, delusions, sleeplessness, isolation, social anxiety, and problems with schoolmates, Michael started counseling and his parents acquiesced to special education testing. By every metric, including Michael's own reports, he was found to suffer from debilitating worry, isolation, and malaise. Over the next three years, Michael was diagnosed with schizophrenia, obsessive compulsive disorder, and autism spectrum disorder. Despite those findings and multiple psychiatric hospitalizations, Michael's parents continued to express skepticism about their son's mental illness and his providers' recommendations.

By the time Michael connected with treatment providers, he had already retreated to the internet. Fourteen-year-old Michael reported that, to mitigate his persistent concerns about

people reading his thoughts, he had stopped playing outside, preferring instead to draw the blinds and read or play on his phone.

Most teens are susceptible to the pull of the internet and social media. But Michael, because of his delusions, OCD, and neurocognitive impairments, was especially vulnerable to the lure of sensational online content. Rather than develop through meaningful relationships with Muslims he encountered in real life, Michael's interest in Islam was borne out of shocking and propagandistic videos he encountered on YouTube and Instagram. Through those platforms, Michael connected to extremist accounts that fueled his obsession and filled his need for connection. Over the next two years, during a period of development that's challenging even for teenagers without Michael's complex issues, his fixation with extremist content and accounts continued. At the same time, however, Michael was candid with his treatment providers about his religious preoccupations and online activities.

At age 17, Michael was referred to an alternative school in Baltimore for children experiencing emotional, behavioral, and learning difficulties. Treatment records indicate that Michael soon thereafter became critical of radical Islamic ideology, despite persistent and excessive internet and social media use.

Shortly after he turned 18, however, Michael transitioned out of an early intervention program for young people with schizophrenia and severe mental health issues to a program at Sheppard Pratt. His treatment regimen thereafter dwindled to monthly medication management and therapy appointments that were almost exclusively virtual and rarely lasted more than 20 minutes. Within months of this sudden and dramatic reduction in care, Michael's disciplinary issues mushroomed and his grades suffered. Michael resumed his obsession with extremist online content, reconnected with an undercover officer posing as a young Muslim woman, and

4

eventually connected with people who recruited him to travel to Somalia to join ISIS. On October 14, 2024, he was arrested at the BWI Airport, after checking in to a flight to London, with plans to continue to Istanbul.

Neither Michael's neurocognitive and psychiatric vulnerabilities nor inadequacies in his treatment regimen excuse his conduct, which is certainly serious and gives rise to legitimate concerns about his risk of recidivism. Fulfilling the goals of sentencing, however, requires due consideration of Michael's complex vulnerabilities and treatment needs to fashion a sentence that accounts for their impact on his culpability and prognosis. Michael's situation is a complicated one, but its complexity should not be addressed via incapacitation.

Rather, in accordance with the directive of 18 U.S.C. § 3553(a), the Court should sentence Michael to 5 years' incarceration followed by a lifetime term of supervised release that includes the following special conditions:

- Participation in a mental health treatment program that includes cognitive behavioral therapy;

- Compliance with all prescribed medications;

- Prohibition against communicating or otherwise interacting with known members of ISIS or any other foreign or domestic terrorist organizations;

- Installation of computer monitoring software; and

- Initial and periodic unannounced searches of computers and devices subject to monitoring.

I. **Michael's history and characteristics reflect his susceptibility to indoctrination due to neurocognitive impairments and mental health issues that surfaced at a young age and persisted throughout his adolescence, and that Michael realizes must be treated for the rest of his life.**

### A.  **Michael's parents emigrated from Liberia amidst harrowing circumstances and settled in Howard County, Maryland.**

Michael's story begins with that of his parents, ███████ and ██████ Teekaye.

██████ and █████ are from Liberia – a small West African country devastated by two civil wars that began in 1989 and spanned the 1990s. During the first civil war, "[i]nnumerable atrocities were committed against civilians, who worked in forced-labor camps and whose homes were looted; children were abducted, abused, and indoctrinated as soldiers. Executions, massacres, and mass rapes led to 200,000 deaths in a country of 2.5 million." Justin Eng, *Study of Internal Conflict Case Studies: Liberian Civil War 1989-96*, U.S. Army War College, Strategic Studies Institute (Mar. 2024).[1] Over half the population of the small nation was displaced, including ██████ and █████ who first fled to Sierra Leone. To do so, they had to cross a river that went up to their chins.

██████ and █████ returned to Liberia but fled again when it was clear that peace was elusive. They paid for passage aboard the Bulk Challenge – a rusty Nigerian freighter packed with more than 2,000 people hoping to flee the carnage in Liberia. *Liberian refugees allowed to enter Ghana, Sierra Leone*, CNN (May 14, 1996).[2] The Bulk Challenge was a cargo ship, not a passenger ship, and reportedly had just one toilet. *See Ghana Refuses to Take In a Boatload of Liberian Refugees*, Reuters (May 14, 1996).[3] The ship was not even considered seaworthy due to a leak in the hold. *West Africa: Fear of refoulement: Refugees from Liberia onboard the Bulk Challenge may be denied right to seek asylum*, Amnesty International (May 14, 1996).[4]

---

[1] Available at https://media.defense.gov/2024/Mar/20/2003416574/-1/-1/0/20240306_LIBERIANCIVILWAR_1989-96.PDF

[2] Available at https://www.cnn.com/WORLD/9605/14/liberia.freighter/index.html

[3] Available at https://www.nytimes.com/1996/05/14/world/ghana-refuses-to-take-in-a-boatload-of-liberian-refugees.html

[4] Available at https://www.amnesty.org/en/documents/afr05/001/1996/en/

Bulk Challenge passengers like ███ and ███ "languished at sea for ten days before Ghana granted them entry." *U.S. Committee for Refugees World Refugee Survey 1997 – Liberia*, U.S. Committee for Refugees and Immigrants, United Nations High Commissioner for Refugees (UNHCR) (Jan. 1, 2997).[5] Ghana had initially refused entry to the refugees, citing their lack of resources and inability to supply humanitarian aid, but relented following a commitment from the UN's then-Secretary General Kofi Annan to provide funding. *See* Shelly Dick, *Liberians in Ghana: living without humanitarian assistance*, Evaluation and Policy Analysis Unit, UNHCR (Feb. 2002).[6] After landing in Ghana, ███ and ███ lived in a crowded refugee camp before moving to a Ghanaian town on the border with Togo. While living in Ghana as refugees, ███ and ███ like many Liberians who had fled extreme violence in their home country, experienced widespread prejudice and persecution.

███ and ███ were eventually offered political asylum in the United States and seized upon that opportunity. They came to the United States in 1997 and settled in Columbia, Maryland. In 1999, ███ and ███ had their first baby, ███ – Michael's older sister, who is 26 years old now. They also bought a house in Hanover, Maryland, where they lived until Michael's arrest in 2024.

**B. <u>Although Michael's learning difficulties and cognitive impairments emerged in elementary school, they were not assessed until the end of his seventh-grade year, after his academic progress dramatically deteriorated.</u>**

Michael was born on August 15, 2003. He met his early developmental milestones like smiling, walking, talking, and toilet training. Exhibit A (RICA Assessment) at 3. Although Michael has always been quiet and never had a large friend group, he enjoyed games like tag and

---

[5] Available at https://www.refworld.org/reference/annualreport/uscri/1997/en/92692
[6] Available at https://www.unhcr.org/sites/default/files/legacy-pdf/3c8398f24.pdf

hide and seek with kids from his neighborhood. He also played little league football in

elementary and middle school. For as long as he can remember, Michael has always loved

animals – as a kid, he befriended a neighborhood cat that loved to look after. He also has happy

childhood memories of going to the zoo and aquarium with his family.




Michael enrolled in Howard County Public Schools beginning in kindergarten. From day

one, Michael was "considered below grade level in reading and math," Exhibit B (Howard

County Public School System Psychological Assessment, May 17, 2018) at 1, and had to repeat

kindergarten, Exhibit A at 6. At the end of Michael's first-grade year, his school's IEP team

recommended educational, psychological, and speech/language assessments due to concerns

about Michael's performance in "reading, math, writing, language, and social/emotional areas."

Exhibit B at 3. ████ and ████ didn't provide consent for those assessments, so Michael

couldn't be evaluated to determine his eligibility for special education services or classroom

interventions and supports. *See id.* at 3. Throughout elementary school, Michael's report cards

"indicate[d] consistent difficulty in all academic areas," but also "satisfactory or better learning behaviors until 5th grade." *Id.* at 1.

During the fifth grade, Michael started struggling more in school. His teachers said that, while "he was always ready to work," he "required reminders to remain on task," "needed support to generate ideas for writing," had great difficulty "recall[ing] previously taught concepts," "needed many opportunities to review those concepts in order to retain the material," and "needed a lot of repetition and clear steps to follow because he struggled to follow multi-step directions." *Id.* at 2. Michael's fifth grade scores on the Maryland state assessment did not meet grade-level expectations. *See id.*

Michael's learning difficulties persisted throughout his sixth-grade year, and his "academic performance dropped dramatically during 7th grade." *Id.* Mid-way through Michael's seventh grade year, his school's IEP team met with ████ and ████ *Id.* Although the IEP team "expressed growing concern regarding Michael's academic performance," including "concerns regarding social/emotional issues with self-control, consistent performance, self-reliance, interpreting social cues, making and keeping friends, being easily influenced by others, as well as issued with organization, distractibility, and inattention," Michael's parents once again declined special education testing. *Id.* at 3.

Approximately six months later, the IEP team reiterated their recommendation for testing. *Id.* This time, for the first time, ████ and ████ gave their consent, although they did not return their portion of the Behavior Assessment for Children. *Id.* Intelligence testing during Michael's seventh grade evaluation reflected scores in the borderline to extremely low range across all metrics, including verbal comprehension, visual-spatial, fluid reasoning, working memory, and processing speed. *Id.* Michael was found to qualify for special education services

as a student with speech/language impairment. *Id.* That year, Michael failed all his classes except gym and scored in the lowest possible band on the state assessment in both reading and math. *Id.* at 2. He was also referred to the office three times for attacking schoolmates. *Id.*

Michael's academic performance and social/emotional functioning dramatically deteriorated during the second half of his eighth-grade year. Between January and May 2018, he missed a total of 28 school days, including 37% of school days in March and 58% of school days in April. *Id.* at 2. This level of absenteeism was sudden – representing a sharp increase not only from the first half of Michael's eighth grade year, when he missed six days, but also his sixth and seventh grade years, when he missed five and twelve days, respectively. *See* Exhibit C (Howard County Public School System records). Moreover, whereas Michael's first and second quarter grades were mostly A's, B's, and C's, during the third quarter of eighth grade he failed three classes, and during the fourth quarter he failed all classes. *Id.*

C. **By the time Michael connected with treatment providers during his eighth-grade year, he had already begun to experience delusions, causing him to withdrawal from his peers and family and retreat to the internet.**

In early March of his eighth-grade year, "Michael came to school and asked to immediately speak with someone about feelings of worry, sadness, and 'maladaptive daydreaming.'" *Id.* The IEP team contemporaneously recommended a reevaluation of Michael's special education eligibility based on suspicions that he had an emotional disability. *Id.* at 1. During that evaluation, Michael reported the following:

STUDENT INPUT
Michael has shared that he worries frequently during the day and at night. Specifically, he has expressed significant concern that others can hear his thoughts and know what he is thinking. Michael makes conflicting statements regarding these thoughts, acknowledging that this isn't possible, yet still wondering if maybe it is. Michael has shared that he doesn't like to be in large groups or sleep at night because of these fears. As a result, he does not want to be in classes or the cafeteria, avoids crowded public areas and has stopped playing outside. Instead, he stays inside to read or play on his phone, with the blinds closed so no one can see inside. He shared that he worries so much at night that he does not sleep. He expressed specific concern about demons disguised as ghosts coming to get him. He also shared uncertainty about aliens coming to get him, stating that aliens and ghosts are "just your imagination", but also stating that he isn't certain if it is possible. Michael shared that he finds his thoughts upsetting and he would like for them to stop, but he doesn't know how to do that. In the past two weeks, Michael has refused to complete school work, indicating that he feels it does not need to be done if it isn't going to be graded or if he believes there will be time to complete it on another day. Michael has also stated that he feels he has no friends.

*Id.* at 4.

The psychologist who evaluated Michael noted:

Michael reports significant feelings of worry, worthlessness, hopelessness, helplessness, and loneliness. He expresses worry over thoughts that may represent delusions. Specifically, he shares that he worries others can hear his thoughts/know what he's thinking, as well as that demons or aliens may come to get him during the night. These thoughts are impacting his functioning in a significant and negative manner, evidenced by Michael's reports that he prefers to be alone and away from others, no longer enjoys engaging activities he used to like (playing outside, playing football, going for walks, etc.), is refusing to come to school and go to class, has difficulty focusing on his work, struggles to making decisions, and does not sleep at night. While Michael has not stated a connection between these potentially delusional thought patterns and incidents of physically aggressive at school, it is possible that Michael's aggression has been a reaction to the belief that others know his thoughts, can hear his thoughts, or that ghosts/aliens are coming to get him.

*Id.* at 7.

Although ███ apparently spoke with the psychologist, she once again refused to complete a behavioral assessment "due to concerns about the school's impact on Michael's emotional functioning." *Id.* at 6. ███ "stated that she feels the school is the reason [Michael was] feeling so much stress and refusing to attend," and she wanted the school to "stay out of it" for that reason. *Id.* at 4. ███ reportedly warned that she might revoke consent for the evaluation in its entirety. *Id.* Although she did not do so, she did revoke consent for the school to speak with Michael's former therapist upon learning that the school had shared information with the therapist about Michael's behaviors and statements during the seventh and eighth grades. *Id.* at 5.

11

Despite her obvious skepticism of the evaluation, ███ nonetheless acknowledged that Michael "no longer enjoy[ed] activities outside the house (playing with friends, playing football on a community team, taking walks) and prefer[red] to remain inside to read, rest, or play on his phone, even when the weather [was] nice and when encouraged to [go] out." *Id.* at 4.

Around the same time that Michael underwent special education testing, he also saw a psychiatrist through the University of Maryland Medical System. Notes from that meeting reflect that Michael began experiencing panic attacks and social anxiety in the seventh grade, Exhibit D (RAISE records) at 1033, which notably correlates with the IEP team's renewed recommendation for special education testing, the dramatic drop in Michael's grades, and incidents of aggression towards his schoolmates. *See supra* p. 5. Michael also "endorsed referential thinking of YouTube videos having special meanings for him," worried that people could read his mind, and was paranoid that people would take pictures of him inside the psychiatrist's office. *Id.* at 1033-34. The psychiatrist prescribed Risperdal, an antipsychotic medication used to treat schizophrenia. *See* Risperidone, Cleveland Clinic (last accessed June 25, 2026).[7] Approximately two months later, another psychiatrist took over Michael's care, and per the recommendation of the Maryland Psychiatric Research Center, Michael began taking Risperdal twice a day. *See* Exhibit D at 1034. The new psychiatrist reported that, in addition to schizophrenia, Michael also exhibited symptoms of obsessive-compulsive disorder (OCD). *Id.* at 1034.

Michael, who was just 14 and 15 years old, did not always take his antipsychotic medication as prescribed. *Id.* at 1034 (noting that, during the summer following his eighth-grade year, Michael had "poor medication compliance."). Teenagers' poor adherence to medication –

---

[7] Available at https://my.clevelandclinic.org/health/drugs/20391-risperidone-tablets

and treatment more generally – is common and well-documented. *See, e.g.*, Ashley Miller, MS, and Robin S. Everhart, PhD, *Nonadherence to Medical Treatment*, American Academy of Pediatrics (Oct. 29, 2025) ("Non-adherence to recommended health-related treatment (e.g., taking medications as prescribed; keeping appointments; following guidelines for seatbelt use, exercise, sleep) in pediatrics occurs about 50% of the time and leads to significant morbidity and mortality).[8] "Teens who are experiencing emotional, social, family or mental health problems struggle more with adhering to medical regimens," and "low investment in the treatment plan can be a sign of depression or other psychosocial problems during the teen years." Daniel Taddeo et al., *Adherence to treatment in adolescents*, 13 Paediatric Children's Health 19 (Jan. 2008).[9] Other factors – like parents' perception of the therapeutic regimen, parents' influence on the teenager, concrete thinking and an inability to appreciate long-term consequences, and undeveloped organizational abilities – may coalesce to drive poor medication and treatment adherence. *See id.* Given evidence of ███ initial skepticism regarding the severity and cause of Michael's mental health issues, along with observations and findings made in connection with Michael's special education assessment, all these factors appear to have been present in Michael's case.

Less than a month into Michael's ninth grade year at Howard High School, ███ took him to the pediatric emergency room at the University of Maryland Medical Center (UMMC) after he reportedly disclosed to his school's counselor that he "want[ed] to join the rebels and be a martyr in Syria." Exhibit E (UMMC record from Sept. 21, 2018) at 341. In keeping with

---

[8] Available at https://publications.aap.org/pediatriccare/article-abstract/doi/10.1542/aap.ppcqr.396502/185239/Nonadherence-to-Medical-Treatment?redirectedFrom=fulltext

[9] Available at https://pmc.ncbi.nlm.nih.gov/articles/PMC2528818/

13

beliefs she'd shared months earlier during Michael's eighth grade special education assessment, ████ told hospital providers that all of Michael's problems were at school. *Id.* During a one-on-one conversation with Michael, without ████ in the room, Michael told the consulting nurse practitioner that he received messages from the television and believed people at school could hear his thoughts, which he endorsed as "crazy." *Id.* According to records from that hospitalization, Michael had already been diagnosed with schizophrenia, shown features of obsessive-compulsive disorder (OCD), and his symptoms were worsening and considered severe. *Id.* at 325. Michael was discharged within one day and referred to the Recovery After Initial Schizophrenia Episode (RAISE) program through the University of Maryland Midtown, Carruthers Clinic. *Id.* at 388.

Less than two weeks later, Michael was seen for his first RAISE appointment. Michael told the treating physician that he began hearing the TV talk to him when he was 10 years old, and that he continued to feel like people could hear his thoughts. *Id.* at 1033. He said that, while at school, he would "go to the bleachers and sit there to play on his phone or sleep." *Id.* Records from subsequent visits at the RAISE program reflect that Michael was often disengaged and played on his phone during therapy sessions in late 2018. In November 2018, his provider wrote that, "video games and telephone continue to dominate his life and spare time." *Id.* at 957.

**D. <u>Michael's interest in Islamic extremism has always been connected to the internet and reflects the sort of harms caused by unfettered access to sensational online content that health providers have identified and cautioned against.</u>**

The deleterious impact of platforms like YouTube on young people's mental health has recently garnered increased public attention via landmark lawsuits and government regulation. In March, a California jury found YouTube and Meta "liable for designing their platforms to be addictive for children and teens, despite knowing it could harm their mental health." John Yang

and Jackson Hudgins, *Jury finds Meta and YouTube liable in landmark youth addiction case*, PBS (Mar. 25, 2026).[10] Just last week, YouTube settled another social media addiction lawsuit brought by a 15-year-old in Florida who similarly alleged that YouTube had designed its platform to be addictive. Lily Jamali and Kali Hays, *Google's YouTube settles social media addiction case with teen*, BBC (Jun. 23, 2026).[11] Both Australia and the UK have passed legislation banning social media, including YouTube, Instagram, Facebook, Twitter, Snapchat, and TikTok, for children under 16. Countries around the world are expected to follow suit.

The UK's social media ban tailed a May 2026 report issued by the Academy of Medical Royal Colleges (AoMRC) that urged a stark warning about "the impact that unfettered exposure to tech and devices is currently having on children and young people's health." Exhibit F (AoMRC Report). Anecdotal evidence of this impact is extremely disturbing, and includes:

- A ten-year-old boy who became so obsessed with gore and murder that he killed a pigeon, the family pet, and had even cut open his own arm to look at blood vessels;

- Numerous young female patients who self-harmed for the validation of men who fetishize it online;

- A 14-year-old boy who amputated his own finger;

- Multiple children with child sex abuse material depicting children between the ages of 4 and 10 on their devices;

- A child attending the Emergency Department distressed after joining a virtual suicide pact with children from other schools;

---

[10] Available at https://www.pbs.org/newshour/show/jury-finds-meta-and-youtube-liable-in-landmark-youth-addiction-case
[11] Available at https://www.bbc.com/news/articles/cly81g7x73po

- A child threatening to kill family members with a weapon having watched torture videos on readily accessible social media sites – not the dark web;

- A child attending the Emergency Department having taken an overdose, after watching TikTok videos that set out the type and amount of drug to take.

- A 14-year-old girl who became acutely distressed and overwhelmed by intrusive thoughts that she might be a sexual offender, having been diverted to extreme adult pornography during pandemic lockdowns.

*Id.* at 10-11, 15. According to the report, "this is just a small representative sample from more than a hundred that were submitted to the study." *Id.* at 11. A study carried out by the Royal College of General Practitioners found that over a three-month period: "more than half of 132 respondents saw at least one case of health harm that could be related to tech and devices every week," and "over a third said they had seen evidence of harm multiple times per week." *Id.* at 8.

As Dr. Scott Bender, a board-certified clinical neuropsychologist and Professor of Psychiatry and Neurobehavioral Sciences at the University of Virginia School of Medicine, who evaluated Michael, writes in his report: "susceptibility to video stimulation is present in most youths." Exhibit G (Report of Dr. Scott Bender) at 11. Indeed,

> A rapidly growing body of research shows that online content is overly stimulating for children, impairs executive functioning, and causes irritability, anxiety, and hyperactivity. The highly stimulating nature of online content also makes it difficult to remove oneself from it, and repeated exposure to algorithmically derived content leads the viewer to increasingly and uncritically believe what they are seeing.

*Id.* According to the AoMRC Report: "Children, in most cases, do not actively search for harmful content [at least initially]. It incrementally builds up in their feeds, diminishing "normal" content while normalising extreme content. With no life experience to draw on, they begin to view the online world as normal." Exhibit F at 12.

These observations by Dr. Bender and the AoMRC track with Michael's own path towards an obsession with Islamic extremism. Michael did not learn about Islam from his parents (who are Christian and took him to Sunday school as a child), friends, teachers, or anyone else that he knew in real life. Rather, as his RAISE clinicians recognized, Michael's knowledge of Islam – and Islamic extremism, more particularly – was based entirely upon the indoctrinating videos that "dominate[d] his life and spare time." *Supra.*; *see also* Exhibit D at 718 (per RAISE clinic notes from June 2019: "He continues to view propaganda videos… We debated his view on extremism and Islam. He was adamant about his viewpoints, although he has never read the Quaran."); Exhibit G at 8 (noting that Michael reported "learn[ing] about Islam on the internet."); Exhibit H (PIW psychological evaluation) at 3 (noting that, as of February 2020, Michael spent between 8-12 hours per day on the internet).

Michael got his first iPhone at just 10 years old. During a September 2019 visit at the RAISE program, wherein Michael "wanted to discuss his introduction to Islam and issues in the middle east," he told his providers that, "when he was 10 years old, he was exposed to videos about ISIS and became fearful that they would hurt him and his family. However, he continued to watch the videos and then began to think like ISIS. He agrees that he became desensitized… He agreed that limiting his exposure to Muslim rhetoric on the Internet may be helpful." Exhibit D at 589.

In 2018 and 2019, Michael's obsession with Islamic extremism manifested as a preoccupation with the Syrian war,[12] which was unquestionably linked to his unfettered exposure to sensationalist and propagandistic videos about the conflict that he encountered online:

---

[12] Records from late 2018 reflect some ambiguity about Michael's initial interest in Syria, and whether he was aligned with ISIS or the U.S.-backed rebel forces. Whereas notes from the University of Maryland's pediatric ER from September 2018 indicate that Michael had told his

- Records from a December 2018 RAISE clinic visit indicate that Michael spent a session "sharing his views about Syrian refugees and the conflict in the middle east," and that he "receive[d] his information from the news and YouTube comments." *Id.* at 930.

- In March 2019, Michael told his RAISE clinicians that he went to bed at 12 or 1 a.m. and woke up at 5:30 a.m. because "watching YouTube videos keeps him up at night." *Id.* at 838.

- Michael spent another March 2019 appointment at the RAISE clinic "glued to his iPhone." When his providers asked him what he was looking at, he "showed [them] a Twitter feed from different factions of the Syrian Civil War." *Id.* at 814.

- Notes from an April 2019 appointment similarly reflect that Michael "stay[ed] up watching YouTube and events in Syria." *Id.* at 795.

- Several weeks later, in May 2019, Michael showed his providers "two videos about miracles associated with soldiers' deaths in Syria." *Id.* at 769.

Michael's providers thereafter told ▇▇▇ about their concerns regarding Michael's exposure to internet-based propaganda related to the Syrian war and its impact on his mental state. *Id.* at 756 ("We separated [Michael] and his mother initially because we wanted to let the mother known about his exposure to propaganda related to the Syrian civil war. We expressed our concern with how being exposed to this is affecting his mental state.").

Despite that warning, Michael spent part of his next visit showing his providers another video about the Syrian war. *Id.* at 749. Notes from a July 2019 visit include: "Pt continues to

---

school counselor he wanted to join ISIS, notes from the RAISE Clinic from December 2018 indicate that he "was distraught by what ISIS has done to Syria and wanted to assist the democratic forces there," "convinced that the only solution is to fight for a good cause (against Al-Qaeda)." Exhibit D at 930, 935.

18

show videos and express thoughts about various topics, including Islam, Isis, and Syria. He also mentioned the Kardashians became famous due to witchcraft and continues to discuss thoughts about aliens. He cited his source as YouTube."). Notwithstanding the RAISE clinicians' persistent concerns about Michael's "exposure to radical propaganda through the internet and phone," there is no indication that any limits on Michael's internet access or phone use were imposed during this timeframe. *See id.* at 720.

    **E.**   **Michael's interest in Islamic extremism was temporally linked to his psychiatric decompensation and driven by his psychiatric and neurocognitive profile.**

Michael's interest in Islamic extremism developed contemporaneously to his psychiatric decompensation. Michael endorsed referential thinking about YouTube videos talking to him at age 14, during the same time frame that his school absences dramatically increased and his IEP team recommended a reevaluation for emotional disability. *See supra.*[13] Within the next six months, he was diagnosed with schizophrenia, observed as showing features of OCD, prescribed antipsychotic medication, and hospitalized after telling his school counselor that he wanted to join the "rebel forces" in Syria. *See supra*. Within the next two years (a timeframe that corresponds with the FBI's initial investigation of Michael and predates his admission to the Regional Institute for Children and Adolescents, as discussed in more detail below), Michael was also diagnosed with autism spectrum disorder and hospitalized twice for psychiatric crises.

"Children with neurodiversity are more likely to face harm from uncontrolled access to tech and devices." Exhibit F at 11. "This group are more susceptible… because of their

---

[13] "Referential thinking" or "delusions of reference" is the tendency to view innocuous stimuli as having a specific meaning for the self. They are a common feature of schizophrenia. *See, e.g.*, Mike Startup, *On two kinds of delusion of reference*, Psychiatry Research (Nov. 2005) (noting that "these delusions are one of the most common psychotic symptoms. For example, 55% of the 811 patients in the International Pilot Study of Schizophrenia had this symptom and, among the 306 patients in the 'concordant group' from this study (those who met all criteria for a diagnosis of schizophrenia), 67% had delusions of reference.") (citations omitted).

decreased ability to approach and interact with social media in a self-protective manner." *Id.*

Features of schizophrenia, obsessive-compulsive disorder and autism spectrum disorder,

including rigid and persistent thoughts, behaviors, and interests, along with deficits in social

communication, help to explain why this is the case:

- Schizophrenia is characterized by persistent delusions, or fixed beliefs that something is

  true, despite evidence to the contrary. *See, e.g.*, World Health Organization,

  *Schizophrenia* (Oct. 6, 2025);[14]

- Obsessive compulsive disorder (OCD) is characterized by the presence of obsessions,

  compulsions, or both. Obsessions are defined by recurrent and persistent thoughts, urges,

  or images that are intrusive, unwanted, and cause distress… Compulsions are defined as

  repetitive behaviors or mental acts that the individual feels driven to perform in response

  to an obsession or according to rigidly applied rules. These behaviors are aimed at

  preventing or reducing the anxiety caused by the obsession but may not be connected to

  the obsession in a realistic way. *See* Report of Dr. Ronald Schouten, following his

  evaluation of Michael's historical medical records and other case-related materials.[15]

- Autism spectrum disorder (ASD) is characterized by deficits in social communication

  and social interactions as well as restricted and repetitive patterns of behavior, interests,

  or activities. These symptoms can co-occur with intellectual disability. *Id.*

  Michael's interest in Islamic extremism was clearly driven by his complex psychiatric

and cognitive framework, which made him more susceptible to the harms of unfettered exposure

to sensationalist, indoctrinating, and radicalized content. Michael's clinicians at RAISE – who

---

[14] Available at https://www.who.int/news-room/fact-sheets/detail/schizophrenia

[15] The defense expects the government to attach this report as an exhibit to its sentencing
submission.

met with him on a weekly or biweekly basis for over three years – believed that his delusions

were "highly influenced by social media." Exhibit D at 610. They also suspected that his

"preoccupations with religion" were a feature of his OCD. *Id.* at 316. Whether obsessional or

psychotic in nature, Michael's thought processes regarding the propagandistic media and

extremist accounts he encountered online were linear and concrete. In other words, because of

his neurocognitive deficits, Michael was "unable to discern the information presented," and think

critically about it. *Id.* at 674.

> As Dr. Bender writes,
>
> Michael has a serious mental illness characterized by paranoid delusions and obsessions (i.e., schizophrenia). Michael's neurocognitive impairment interacts with these symptoms and further explains how he became preoccupied with Islam, especially as presented on the internet. For example, he functions at a very low level of intelligence, is distractible (especially by high stimuli experiences such as internet videos), and is easily swayed.
>
> Symptoms of schizophrenia compound Michael's neurocognitive vulnerabilities by distorting his beliefs and causing delusions. Indeed, the aggression and related antisocial features noted in his history stem from the irrational and distorted beliefs arising from schizophrenia and are exploited by social media. Without medication, his depression, obsessions, delusions and neurocognitive challenges have made him vulnerable to sensationalized and exploitative religious videos and propaganda, and Michael's worldview was clearly influenced by YouTube and other social media. There is less evidence of delusional thoughts or behavior pertaining to areas not presented to him on the internet, further demonstrating the primary role of social media in his religious indoctrination.

Exhibit F at 10-11. With respect to the impact of Michael's neurocognitive deficits on his actions

and behavior, Dr. Bender's findings are largely consistent with observations made during

Michael's psychological evaluation at the PIW in early 2020:

Overall, Michael Teekaye's impaired cognitive functioning, particularly his difficulties understanding abstract concepts, and his challenges understanding social interactions result in him not fully comprehending the consequences of his behavior. Additionally, Michael Teekaye may be more impressionable than his peers, as critically thinking through actions and consequences is challenging for him. While Michael Teekaye presents with risk factors, such as making statements regarding potential intent to harm others, it appears that Michael Teekaye likely does not fully understand the impact of these statements. Similarly, Michael Teekaye may not recognize why others take issue with his expression of "extremist" viewpoints or thoughts of harming others. It is also important to consider Michael Teekaye's culture, as an African American, Muslim, first generation American adolescent boy. Michael Teekaye's intersecting identities may result in others interpreting his behaviors as more aggressive or pathological than they are. Therefore, it is critical to continue to monitor Michael Teekaye's behaviors and symptoms, while also respecting his identities and encouraging him to think critically about his personal values.

Exhibit H at 12.

### F. While connected with the RAISE Clinic, Michael was candid with his treatment providers about his online activities and preoccupation with Islamic extremism.

Michael went to the RAISE program from October 2018 until November 2021. Throughout that period, he met with his treatment team, which generally consisted of a counselor and psychiatrist, for an hour every one or two weeks. He rarely missed appointments. While connected with the RAISE program, Michael spoke often and candidly with his clinicians about his interest in Islam, including by sharing the media he consumed and the communications he had with people online:

- A note from a June 2019 appointment reads, "Pt spends the rest of the session sharing his views about islam and showed videos to support his view of real Muslims v. fake Muslims… Team challenged his views on what is real and what isn't and encouraged him to read test instead of watch videos on YouTube." Exhibit D at 713.

- A note from an August 2019 appointment indicates that Michael showed his providers text messages and a voicemail from people he was communicating with on Instagram. *Id.* at 632.

22

- A note from a September 2019 visit indicates that Michael "wanted to discuss his introduction to Islam and issues in the middle east," including ISIS. *Id.* at 589.

- A note from an October 2019 visit indicates that Michael "talk[ed] about different muslim instagram accounts [he] made, and seem[ed] to indicate that there's something significant about how many followers he had (not that more is better, but that specific numbers are better than others)." *Id.* at 517.

- Another note from October 2019 indicates that Michael stated that he is talking to a muslim extremist in the UK," and that he'd "posted a video of himself with his face covered with a mask and received likes. *Id.* at 508.

- A note from a November 2019 visit indicates that Michael reported his Instagram account was suspended but told his clinicians that "he still talks to people on WhatsApp," and showed his clinicians several videos. *Id.* at 479.

- A note from a December 2019 visit indicates that "Michael continues on social media. He states that he is not posting items as often as before. He has now met a 10th grade girl in Minnesota (also online) whom he says he is going to marry. She too is converting to Islam." *Id.* at 464.

- Another note from a December 2019 visit indicates that Michael talked about Facetiming "with some Muslims in the UK who wanted him to be an entrepreneur but couldn't give any other details. Issues related to the possibility of being scammed was discussed." *Id.* at 444.

- A note from a June 2020 visit indicates that Michael talked about making "some sort of threat on his youtube channel which the FBI notice[d] and then the FBI called his mother and suggested he may need to go back to the hospital." *Id.* at 313.

Michael's candor to his RAISE clinicians undermines Dr. Schouten's opinion that Michael's record shows "deceitfulness," which is one of the criteria Dr. Schouten relied upon to diagnose Michael with antisocial personality disorder (APD). *See* Schouten Report at 22. Rather than base his opinion regarding Michael's candor on the "many times" that Michael expressed his concerning views to his clinicians at RAISE,[16] Dr. Schouten relied upon (1) statements that 16-year-old Michael made during a psychiatric hospitalization; (2) statements that Michael made to the FBI in 2020 and 2023; and (3) a misrepresented statement made by one of Michael's RAISE clinicians to the FBI.

As to the statement made by the RAISE clinician: Dr. Schouten wrote in his report that Michael's former counselor at RAISE told the FBI in July 2022 – after Michael had aged-out of RAISE and while he was connected with Way Station, as discussed below – that she didn't believe Michael was being "candid" with his new providers about his interest in Islam. *Id.* at 22. In fact, Michael's former counselor told the FBI that Michael infrequently contacted her via text message and told her that he was reengaged with Islam. She said that she didn't believe he was speaking "openly" with his current therapist – not that she thought he was lying to them. She was right. The counseling that Michael received through Way Station and the relationship he developed with his providers there were vastly different than his experience at RAISE. Indeed, there is no indication in the Way Station records that his counselors there ever asked him about his obsession with Islam and Islamic extremism, nor his online activities.

**G. <u>Despite unconditional love for their son, Michael's parents continually expressed skepticism regarding his cognitive and psychiatric issues, which delayed intervention and may have undermined treatment efforts.</u>**

---

[16] Schouten Report at 29 (writing that Michael "has expressed his views [about extremist Islamic ideology] many times to his therapists.").

There's no question that Michael's parents love their son deeply and unconditionally. Since Michael entered middle school, they met with countless educators and mental health providers. They took Michael to the pediatric emergency room for psychiatric hospitalizations and visited him after he was emergency petitioned in states of crisis. They accompanied Michael to weekly therapy and medication management appointments at the RAISE clinic. They sat down with the FBI to talk about Michael's mental health and interest in Islamic extremism. Their lives were totally upended when the FBI raided their house on October 14, 2024 – the day of Michael's arrest – and then the press gathered outside, causing them to move from the place they'd called home for two decades. Since Michael's arrest, they have sat down with his defense team, regularly spoken with Michael, and written heartfelt letters on his behalf. *See* Exhibits I and J (Letters from ██████ and ██████ Teekaye).

While there can be no doubt that ██████ and ██████ love Michael, their journey towards accepting and addressing his complex issues and treatment needs has been a difficult one. When the IEP team at Michael's elementary school asked ██████ and ██████ for permission to evaluate Michael for special education placement, they refused. *Supra* at 6-7. After five years of stunted academic progress, when the IEP team at Michael's middle school approached them to ask about special education testing, ██████ and ██████ refused once again. *Id.* at 7. They relented months later, after Michael's grades had plummeted. Even then, however, they appeared to believe that Michael's school – not his cognitive or mental health issues, and not his excessive internet use – were driving his distress. *See supra*. Because ██████ and ██████ didn't give their consent for special education testing before the end of Michael's seventh grade year, Michael wasn't evaluated for interventions that could have mitigated his learning difficulties and social/emotional issues during elementary school and most of middle school. He was not given

an IEP until his eighth-grade year – at which point he was already experiencing delusions, overwhelming anxiety, and had retreated to the internet for entertainment and social connection.

███ took Michael to most of his appointments at the RAISE clinic. ███ came on occasion but was often traveling for work – in general, ███ spent about three months in West Africa and a month or so back home. When ███ was home, he often accompanied Michael and ███ to Michael's appointments and spoke with Michael's clinicians about his concerns. The "Social History" portion of Michael's RAISE records between October 2018 and March 2019 indicates that, "According to chart and previous treaters, [███] does not feel [Michael] has a mental illness and [███] has expressed skepticism about her son having psychotic symptoms." *See* Exhibit D at 1033. In January 2019, Michael reported that he hadn't taken his Risperdal for 5 days because ███ told him to stop it. *Id.* at 905. Eight months later, in September 2019, ███ reportedly told Michael's clinicians that he believed Michael's dislike of school caused his behavior and was "generally dismissive" of Michael's mental illness diagnosis. *Id.* at 566. Throughout 2020, ███ repeatedly expressed skepticism about Michael's medication regimen. *See id.* at 420, 387, 202. In September 2020, ███ reportedly "showed [Michael] video of beheading to dissuade him from radical Islam. [Michael's] mom was trying to show team but [Michael] expressed that he was upset. [Michael] said that the reason he gravitated to Islam in the first place is due to a video about a beheading so he didn't understand why his parents would show him again." *Id.* at 251.

Dr. Bender believes that Michael's parents' skepticism regarding their son's issues may have exacerbated Michael's conditions because Michael thought they were unsupportive, even if his perception did not align with their dedication to him:

> Michael's father in particular appears to hold strong ideas about mental illness and
> expectations of Michael, which has led to emotional upset and threats of running

26

away or being taken to Africa. Michael perceived a profound lack of support from his parents, which energized his already obsessive interest in things they did not support, primarily Islam.

Exhibit F at 11.

### H. **Michael's affinity for Islamic extremism waned once he enrolled at the Regional Institute for Children and Adolescents, an alternative school in Baltimore for children experiencing emotional, behavioral, and learning difficulties.**

Michael's social media posts drew the FBI's attention in late 2019. The FBI began investigating Michael in earnest in early 2020, when they met with ▮▮▮ and ▮▮▮ several times, and even spoke with Michael in person and by phone. Over the next six months, despite the FBI's investigation, Michael continued to communicate via Instagram with an undercover officer and post extremist content on his public Instagram pages. In July 2020, he even posted about wanting to travel to Somalia to join Al Shabab before the FBI's investigation.

Within the next few months, however, Michael's attitude towards Islamic extremism appeared to have dramatically shifted. While it is clear from RAISE records that Michael still spent a great deal of time online, in early and mid-2021, Michael told his providers that he had begun posting "conscious stuff about antireligion," Exhibit D at 160, to "warn others about religious extremism," *id.* at 130.

This timeframe notably corresponds with Michael's enrollment at the Regional Institute for Children and Adolescents (RICA), which is an alternative high school in Baltimore for children experiencing emotional, behavioral, and learning difficulties, in the fall of 2020. During Michael's ninth grade year at RICA, he earned all A's and B's and had six relatively minor disciplinary incidents. *See* Exhibit K (RICA records at 69 and 73). He again earned all A's and B's during the first quarter of tenth grade and had one C (Spanish) and one D (Algebra) during

the second quarter of that year. *Id.* at 57. Between September 2021 and December 2021, Michael

had seven relatively minor disciplinary incidents. *Id.* at 60.



As discussed below, however, Michael's academic and behavioral performance at RICA

changed dramatically in the beginning of 2022, once he was no longer connected with the

RAISE Clinic.

### I. Michael's academic performance plummeted and his affinity for Islamic extremism renewed once he was disconnected from the RAISE clinic and his treatment regimen greatly diminished.

In November 2021, Michael stopped going to the RAISE Clinic and began receiving

treatment through Way Station, an affiliate of Shepphard Pratt. Michael was sad to leave the

RAISE program, where he'd been seen for over three years.

Way Station diagnosed Michael with schizophrenia (primary) and OCD (secondary).

Michael's therapy through Way Station was almost exclusively telephonic or virtual, even

though Michael said during a September 2021 diagnostic evaluation that he preferred in person

therapy. In stark contrast to his treatment regimen through RAISE – which consisted of weekly or biweekly in-person, hour-long appointments – Michael's therapy and medication management appointments through Way Station occurred monthly and rarely lasted more than 20 minutes. Michael saw different therapists, including several clinical interns and Licensed Master Social Workers (who have less experience and autonomy than Licensed Clinical Social Workers, and cannot diagnose conditions or provide therapy without supervision). During a December 2022 therapy appointment, Michael reportedly requested bi-weekly in-person appointments. Despite that request, he continued to be treated via telehealth. There is no indication in the Way Station records that Michael's providers there ever spoke with his former clinicians at RAISE. There is also no indication that his Way Station providers ever spoke to Michael about his interest in Islam or his internet activities.

Within months of leaving the RAISE Clinic, Michael's academic performance and behavior at school declined. During his second semester of tenth grade, Michael received two C's and one D. Exhibit I at 57. He also incurred 29 separate disciplinary incidents – most of which involved sleeping. *Id.* at 59. In July 2022, Michael was arrested and charged with disorderly conduct after he brought a knife to an elementary school parking lot following a longstanding dispute he had with a former schoolmate. *See* PSR at ¶ 37. During the eleventh grade, Michael received mostly C's and finished the year with a GPA of 2.67.

All the conduct that Michael has stipulated to as part of his plea agreement occurred in 2023 and 2024, long after he had left RAISE, and while he was receiving far less frequent and comprehensive treatment through Way Station.





### J. The government's opinion regarding the nature of Mr. Teekaye's offense conduct and his risk of recidivism and violence does not account for his age, his diagnoses and treatment course, and his insight and amenability to treatment.

In his report, Dr. Schouten opines that Mr. Teekaye's diagnoses were not "related" or "associated" with his criminal conduct, and that "both Mr. Teekaye's risk of violence in the community and of recidivism must be considered to be high." Schouten Report at 23-29. Despite Dr. Schouten's extensive review of Mr. Teekaye's records, his opinions are not persuasive because they are internally inconsistent and fail to address critical aspects of Mr. Teekaye's history and characteristics that bear upon his risk of recidivism and so-called "dangerousness."

First, Dr. Schouten's opinions are internally inconsistent. On the one hand, Dr. Schouten writes that, "Mr. Teekaye has a longstanding history of behaviors and symptoms that put him at

elevated risk of violence in the community. These behaviors and symptoms date back at least to age 14 and are consistent with diagnoses that include antisocial personality disorder and autism spectrum disorder (ASD), with accompanying intellectual and language impairments." *Id.* at 27. Dr. Schouten suggests that features of antisocial personality disorder and ASD make Michael less capable of navigating social situations, letting go of conflicts, reasoning through problems, and expressing his emotional, physical, and social needs. *Id.* at 27-28. Dr. Schouten also writes at length about what he terms Michael's "violent fantasies and ideations," along with Michael's repeated expressions of extremist viewpoints to his therapists and on his social media accounts (without ever acknowledging or challenging the opinion of Michael's clinicians at RAISE that Mr. Teekaye's fixation with Islamic extremism was a feature of his OCD (or his delusions), as discussed above). *See supra.* Yet, at the same time, Dr. Schouten summarily dismisses the notion that Michael's complex mixture of neurocognitive and mental health conditions was at all "related" or "associated" with his offense conduct. *See* Schouten Report at 23-27. These opinions do not square with one another. It does not make sense to say that Michael poses an increased risk of danger due to features of his neurocognitive and psychiatric profile, but also that Michael's particular (and complex) profile had nothing to do with his offense conduct.

Second, Dr. Schouten's opinions regarding Michael's behavior fail to account for Michael's age, which contextualizes his behavior and helps to explain why it is not reflective of his future risk. Based upon historical records review, Dr. Schouten writes that "Mr. Teekaye has a history of rejecting social and emotional support that could have a mitigating effect on his violence risk potential," a "history of isolating himself from his family," and "had frequent conflict with his mother and father." *Id.* at 28. With respect to the notion that Michael "reject[ed]

31

social and emotional support," his treatment through the RAISE Program, progress during his first year-and-a-half at RICA, and post-offense conduct (as discussed below), indicate otherwise.

During the three years that Michael was seen at RAISE, he attended regular treatment sessions and shared a great deal of information about his thoughts, online activities, and behaviors with his clinicians. *See supra*. While it is true that Michael isolated from his friends and family when his mental health decompensated towards the end of middle school, and that he continued to experience social isolation throughout his adolescence, it is also true that most teenagers "isolate" or "conflict" with their parents. Dr. Schouten completely ignores this reality – electing instead to pathologize what is, at least to some extent, commonplace teenage behavior. Since his arrest, however, Michael has strengthened his relationships with his parents and sister. They represent one of his primary motivations for gaining insight into his conduct and addressing his treatment needs, and they serve as a critical source of support for Michael amidst this difficult experience.

Dr. Schouten also ignores the role of brain development in mitigating Michael's risk of recidivism. The conduct that Michael has pled guilty to committing occurred during a distinct developmental stage known as "emerging adulthood" that spans the late teens through early 20s. During this period of brain development, the prefrontal cortex continues to develop both structurally and functionally. The prefrontal cortex is like the "CEO" of the brain and is associated with executive functioning, which refers to processes that are involved in the "conscious, goal-directed control of thought, action, and emotion." Exhibit L (Brief from Dr. Jennifer Woolard). During emerging adulthood, there is a "maturity gap," wherein the socio-emotional brain system that is responsible for emotion, rewards, and social processing is more fully developed, but the cognitive control brain system is not. *Id.* at 4-5. As a result of this

32

maturity gap, "to some extent young adults are less able than mature adults to control impulses, less able to resist pressure from peers, less likely to think ahead, more likely to take risks, less likely to give weight to potential costs and losses of risky behavior, and more driven by the thrill of rewards." *Id.* at 6.

Although emerging adults have some capacity for behavioral regulation, their cognitive control system is more easily overwhelmed and overpowered by peer pressure, impulses, and perceived rewards. *Id.* at 7. A growing body of research suggests that significant development of the prefrontal cortex occurs between the ages of 18 and 25. This body of research supports the notion that, as the brain's cognitive control system develops, the immaturity, impulsivity, risk-taking, and peer pressure that may drive young people's thought processes and behavior will subside, and their risk of recidivism will decline. *See id.* at 8.[17]

Finally, the Court should not be persuaded by Dr. Schouten's opinion that Michael has antisocial personality disorder, and not schizophrenia. Dr. Schouten did not personally examine Michael. Instead, he relied upon historical records to arrive at his own diagnoses and call into question the diagnoses of providers who not only personally examined Michael but, in some cases, regularly met with him over a period of years. Rather than opine that Michael's conduct reflects antisocial features – an observation that Dr. Bender makes in his report – Dr. Schouten concludes that Michael has antisocial personality disorders. Personality disorders carry the

---

[17] The Supreme Court has recognized the significance of brain development in a series of cases that stand for the principle that "youth matters in sentencing." *Jones v. Mississippi*, 141 S.Ct. 1307, 1314 (2021) (discussing the Court's Eighth Amendment cases that address juvenile punishment). While this line of cases concerns punishment for conduct that occurs before the age of 18, the Supreme Court's holdings in *Thompson*, *Roper*, *Graham*, and *Miller* are all based on science that does not draw a bright line at that age.

stigma of being who someone is, rather than something they have. For that reason, and despite

research to the contrary, they are commonly (mis)understood to be treatment resistant.

Personality disorder diagnoses have also faced scrutiny for being overly subjective,

imprecise, and unreliable. Kathleen Wayland and Sean D. O'Brien, *Deconstructing Antisocial Personality Disorder and Psychopathy: A Guidelines-Based Approach to Prejudicial Psychiatric Labels*, Hofstra Law Review 519, 540 (2015). "In addition, excessive focus on antisocial

behavior without attention to contextual factors such as trauma history, thought or mood

disorders, and neuropsychological dysfunction, may lead to failure to identify relevant diagnostic

considerations… In the absence of a contextualized understanding of what drove such behaviors,

it is difficult (if not impossible) to separate symptoms from subjective judgments." *Id.*[18]

**K.**  **Since his arrest, Michael's symptoms have improved due to his own insight and treatment adherence.**

Following his arrest and initial appearance on October 15, 2024, Michael was taken to the

Chesapeake Detention Facility (CDF), where he has remained ever since. During a brief intake

visit on October 17, 2024, Michael was forthcoming about his mental health needs. He said that

he wanted to start medication and reported taking Abilify and Prozac. He was prescribed Abilify

5mg and Prozac 10mg and started taking them daily. Although he'd been prescribed both

---

[18] It is somewhat ironic that, in casting doubt upon Michael's schizophrenia diagnosis, Dr. Schouten opined that it "may have been influenced by the racial bias observed to exist in the diagnosis of psychotic illness among African Americans," when evidence also points to racial bias in the diagnoses of personality disorders like APD. *See, e.g.*, Howard N. Garb, *Race bias and gender bias in the diagnosis of psychological disorders*, Clinical Psychology Review (Dec. 2021); *see also* Michael T. Baglivio et al., *Racial/Ethnic Disproportionality in Psychiatric Diagnoses and Treatment in a Sample of Serious Juvenile Offenders*, J. Youth Adolescence (Sept. 2016) ("The results indicate Black males are 40% more likely… to be diagnosed with conduct disorder than Whites, even upon considerations of trauma, behavioral indicators, and criminal offending.").

medications previously, he'd relied on Abilify injections and been non-compliant with his Prozac prescription. While detained, Michael initially struggled with his Prozac compliance and was referred to behavioral health in November 2024 and January 2025 after missing a few consecutive days of the medication.

Michael's Prozac compliance improved over the following months until he was abruptly taken off all his medication in late April 2025 due to what appears to be a clerical error. Records from CDF reflect some confusion about Michael's ID number, and it appears that other inmates' information was stored under Michael's profile in CDF's records system. For example, notes from an "intake" appointment on November 6, 2024, describe Michael as a "34 year old single AA male with an extensive history of incarceration and residential community placement," and note that he has three teenage children. Another note from February 17, 2025, references a discrepancy between Michael's appearance and ID photo with the photo in CDF's records system. And a note from a February 28, 2025, appointment mentions a gunshot wound history from 2016. Michael continued to receive Abilify and Prozac despite all of these records issues until April 28, 2025, when it appears that a psychiatric care provider forgot to renew Michael's medication at the end of a chronic care appointment.

For the next two months, Michael went without medication. About two weeks after his medication was abruptly stopped, Michael was sent to segregation after a guard observed Michael fighting with another inmate. The tenor of Michael's legal visits shifted. His defense team was not aware of the medication issue and began to wonder whether a competency evaluation was needed. Michael continued to struggle without medication until July 17, 2025, when he submitted a sick call slip stating, "I want to retake the previous pills I was on, which include Abilify for my mental health." *Id.* at 8.

Since restarting his medication, Michael has taken his Abilify and Prozac consistently and has not had issues with non-compliance. This experience, while unfortunate, reflects Michael's insight into his mental health issues and treatment needs. He was able to identify that his symptoms were increasing and advocate for himself within the institution, despite his cognitive and psychiatric limitations. Michael received feedback from his peers in jail and his legal team that the medication seemed to be working, as his affect and outlook seemed to improve. This feedback increased Michael's confidence in seeking care.

While detained, Michael has not had access to the social media sites like YouTube and Instagram that used to dominate his time and attention and set the stage for his criminal conduct. He has had to adjust to the absence of these platforms in his life and develop new ways to pass the time and feel productive, particularly inside a detention facility like CDF that doesn't offer much programming. He has had to develop coping strategies to deal with the stress of incarceration, his uncertain future, and the profound guilt he feels towards his family:

> I should have listened to my mom, dad, and sister. I should have taken care of them before I tried to take care of big world problems. I should have been patient with my family. Being in here I can't do anything for my family. I feel like a burden to them. I've gotten help from my family while I'd been here – not from ISIS or people who were just online. I know my family loves me. I haven't always felt that way. I see their support every day through this experience.

Exhibit M (Letter from Michael Teekaye Jr.)

To do so, Michael has turned to books, the Quran, silly video games, exercise, and the Muslim community inside CDF. He writes, "I also feel more in control of my emotions. When I'm feeling angry, frustrated, or impatient, I read books, listen to the Quran, play video games, or work out to calm down." *Id.* For the first time, Michael has connected with other Muslims in person to learn more about Islam. He writes:

36

Now at CDF I'm more in contact with other Muslims and the imams here. They taught me that I don't need to go and fight in order to be a good Muslim. I can practice my faith by taking care of my family. They've guided me to a better path.

*Id.*

Michael's family has noticed a difference in him, too. His father, ▮▮▮▮ writes:

With all the issues and circumstances concerning Michael's mental health we will like the Judge to understand that the incarceration of Michael for almost two years has change him tremendously for a life given second chance. For example because of Michael's mental illness his room at our house was always kept dirty, he kept away from us he had no friends. Now as we communicate with him in jail he tells us that he has been busy working cleaning up his jail room, he also told us that he doesn't like to share room with careless room mates. Michael is now asking us to pray for him through our Lord and Saviour Jesus Christ something he never did before he went to jail. Michael wants to work, learn trade. He says a lot of good stuffs and is very serious about what he is saying.

I would like the Judge to know that Michael current medication is working properly he has been more calm and moderate is discussions are on point and accurate. He is ready to go back to college or trade school and to drive his own car to school and to work.

Michael is now communicating with us in the way never saw before, he asked us positive questions on interesting topics. For example he asked me what ethnic groups I'm from in Liberia he also asked his Mom the same questions. We told him and here were other important questions that follow we have had very good and enjoyable conversations with Michael these days as compare to those days. I believe his medication and treatment are doing good.

Exhibit I (Letter from ▮▮▮▮ Teekaye).

His mother, ▮▮▮▮ writes:

I will also like the Honorable Judge to know that since Michael's arrest and incarceration he has transform tremendously for so many good reasons, for example when we have conversation with him in Jail he talks about cleaning his room, want to improve his Godly devotion my family and I have had many conversations with him and realized some real big good changes, we pray that everything work out for the best of his life.

Exhibit J (Letter from ▮▮▮▮ Teekaye).

And his sister, ▮▮▮▮ writes:

37

Since Michael's arrest, I have noticed significant changes in him. He has repeatedly expressed remorse for the pain and stress his actions have caused our family. He has apologized many times and has spoken about wanting a positive future. He has told me that he wants to pursue a career as an electrician, plumber, or HVAC technician when he is released.

While I do not want my brother to remain incarcerated, I can honestly say that when I speak with him now, he sounds more grounded and clear-minded than he has in many years. We are able to have normal conversations about life, work, school, and his future rather than conversations centered around obsessive thoughts or unrealistic beliefs. For the first time in a very long time, I feel like I have my brother back.

Michael is hopeful about his future. He talks about obtaining a driver's license, building a career, and eventually living independently. Before his arrest, these were not things he discussed. It often felt like he was living in a completely different reality. Today, he appears to recognize the seriousness of his actions and understands that this is not the life he wants for himself.

I believe Michael has the ability to become a productive member of society. He has a loving family that supports him and wants the best for him. He has even acknowledged how fortunate he is to have that support. Those conversations have meant a great deal to me because, for many years, we were unable to communicate in that way.

Exhibit N (Letter from ███████ Teekaye).

Notably, after evaluating Michael, Dr. Bender shares Michael's family's optimism about

Michael's insight and potential:

In summary, medical, collateral, academic, and correctional records plus the current neuropsychological evaluation indicate that Michael was susceptible to indoctrination due to intellectual and other neurocognitive impairments, as well as impaired reality testing, paranoia, fear, hypersensitivity, impulsivity, fears of abandonment and rejection, and poor social skills. He has had difficulty interpreting the normal nuances of interpersonal behavior, which added to his vulnerability to propaganda, especially when presented in (what he perceived to be) credible social interactions.

Fortunately, objective testing indicates that his insight is improving and he is interested in continued treatment to further decrease his intrusive, irrational, and distressing thoughts. As such, Michael is an excellent candidate for therapy. A very large body of research supports the effectiveness of cognitive behavioral therapy (CBT), which can capitalize on his insight and willingness to change. Importantly, his symptoms (and associated susceptibility to radical beliefs) are in much better

control on medication, especially antipsychotics. As noted, family members and others who model adaptive behaviors in both secular and religious contexts can provide guidance and support.

Exhibit F at 12.

## II. Consideration of the § 3553(a) factors demonstrates that a 5-year sentence followed by lifetime supervision that includes conditions to address Mr. Teekaye's complex needs and mitigate his risk of recidivism is reasonable.

To impose a sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing under § 3553(a), the Court must consider Mr. Teekaye's neurocognitive impairments and mental health conditions, because those issues bear upon notions of culpability, sentence severity, deterrence, and rehabilitation. To be clear, Mr. Teekaye's criminal conduct is not excused by his neuropsychological profile, or even his heightened vulnerability to online indoctrination. Given Mr. Teekaye's extensive history of mental health treatment, it is reasonable to wonder whether Mr. Teekaye remains at risk of online indoctrination in the future. But Mr. Teekaye's insight, amenability to treatment, maturity and brain development, and support network, along with his release plan and tailored supervision conditions, represent significant protective factors that will reduce his risk of reconnecting with extremist ideology and actors on the internet.

### A. Public safety is best achieved through community-based services combined with supervision conditions, which will address Mr. Teekaye's risk of recidivism and facilitate his rehabilitation.

Long-term public safety is inextricably linked with effective treatment of Mr. Teekaye's mental illness. According to Dr. Bender,

> [Mr. Teekaye's] prognosis is good given his youth, positive response to medication, self-reported willingness to change, and awareness of a need for change. He would significantly benefit from (1) continued pharmacotherapy for symptoms of schizophrenia, (2) carefully targeted and specialized cognitive behavior therapy addressing irrational thought processes, and (3) modeling Muslims and other adults

with less radical beliefs. It is also important to note that symptoms of schizophrenia and radicalization fade over time and as a result, the associated behavioral risks fade as well. Nevertheless, it is recommended that [Mr. Teekaye's] access to inflammatory or sensationalistic material on the internet be restricted for the foreseeable future.

Exhibit G at 11-12.

> ### i. There is no guarantee that Mr. Teekaye will be designated to a BOP facility that is equipped to meet his treatment needs and, if he is designated to a U.S. Penitentiary based on his security classification score, he risks severe harm to his mental health.

While Mr. Teekaye would have greater access to regular mental health care if he is designated to a Bureau of Prisons (BOP) Care Level 3 institution – and ideally a federal medical center – there is no guarantee that he will be so designated. Given the BOP's long-standing staffing shortages and well-documented failure to deliver adequate mental health care to its inmate population, if Mr. Teekaye is designated to a Care Level 2 or Level 1 facility, he will not receive adequate treatment resources and will be at risk of falling into the "all-too-common progression whereby psychiatric symptoms become interpreted primarily through a disciplinary rather than clinical framework." Exhibit O (Affidavit of Dr. Andrea Brockman); *see also* Exhibit P (Affidavit of Jack Donson) at 5-6. As Dr. Andrea Brockman, a clinical psychologist who spent over a decade working within the BOP, including extensive work with high-risk and complex inmate populations, warns in her declaration:

> Individuals experiencing psychotic decompensation may become increasingly withdrawn, suspicious, rigid, or socially impaired. Without adequate psychiatric resources, these manifestations may be addressed through disciplinary sanctions or restrictive housing rather than clinical intervention, thereby accelerating psychiatric decline.

Exhibit O (Affidavit from Dr. Andrea Brockman).

Mr. Teekaye's risk of psychiatric decline may be particularly acute if he is designated to a U.S. Penitentiary based upon his estimated security classification.[19] According to Jack Donson, who was employed by the BOP for over two decades and is an expert with respect to security classification, correctional programs, and treatment:

> A U.S. penitentiary designation will be extremely problematic for Mr. Teekaye given his mental health history, age and lack of federal prison experience. U.S. Penitentiaries are violent, predatory environments that are gang-centric and difficult to navigate, even for older adults without a mental health history. Young offenders are recruited to join gangs for protection, pressured to move drugs or other contraband and are more vulnerable to sexual assault.  Rehabilitation in this environment is difficult, and it is more likely that Mr. Teekaye would be influenced to develop more of a criminal orientation than to participate in or receive treatment.

Exhibit P (Affidavit from Jack Donson) at 4. Vulnerable inmates inside U.S. Penitentiaries often request protective custody, which "results in segregation [and] means 23-hour daily lockdown in restrictive housing within the special housing unit (SHU)." *Id.* at 5.

The use of solitary confinement to house vulnerable prison residents, especially those with serious mental illness, is well-documented, as are the deleterious impacts of solitary confinement on prison residents' mental health. *See, e.g.*, Jessica T. Simes et al., *Mental health disparities in solitary confinement*, 60 Criminology 538, 540 (2022) (finding high levels of solitary confinement among Pennsylvania prison residents between 2007 and 2016, indicating that "mental illness—a risk factor for involvement in the criminal justice system—also amplifies the intensity of criminal punishment."). "Nearly every scientific inquiry into the effects of [solitary confinement] over the past 150 years has concluded that subjecting an individual to more than 10 days of involuntary segregation results in a distinct set of emotional, cognitive, and

---

[19] To hopefully avoid this, and as discussed below, the Court should make recommendations that will allow the BOP discretion to designate Michael to a facility below his scored security level, where he will have more access to treatment and programming.

physical pathologies." David Cloud et al., *Public Health and Solitary Confinement in the United States*, 105 Am. J. Pub. Health 18 (2015). Indeed, the stark conditions in solitary confinement "can be as clinically distressing as physical torture," Jeffrey L. Metzner & Jamie Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. Am. Acad. Psychiatry & L. 104, 104 (2010), and are "frequently used as a component of torture," Craig Haney, *The Psychological Effects of Solitary Confinement: A Systemic Critique*, 47 Crime & Just. 365, 373 (2018). The psychological harms of solitary confinement are wide-ranging:

> These include stress-related reactions (such as decreased appetite, trembling hands, sweating palms, heart palpitations, and a sense of impending emotional breakdown); sleep disturbances (including nightmares and sleeplessness); heightened levels of anxiety and panic; irritability, aggression, and rage; paranoia, ruminations, and violent fantasies; cognitive dysfunction, hyper-sensitivity to stimuli, and hallucinations; loss of emotional control, mood swings, lethargy, flattened affect, and depression; increased suicidality and instances of self-harm; and, finally, paradoxical tendencies to further social withdrawal.

*Id.* at 371-72.

Recent analysis by the U.S. General Accountability Office of BOP data from fiscal years 2018 through 2022 found that, while BOP's total population decreased by 13%, the rate of SHU placements as a percentage of the total BOP population increased from 29 to 35%. U.S. Gov't Accountability Office, *Bureau of Prisons: Additional Actions Needed to Improve Restrictive Housing Practices*, at 20 (Feb. 2024).[20] And while the BOP's SHU policy states that individuals with "serious mental illness" should not be placed in a SHU unless they present an immediate or serious danger to themselves, staff, or facility operations, the GAO determined that the BOP continually violated that policy. *Id.* at 17 (citing Dep't of Justice, Bureau of Prisons, *Special Housing Units*, Program Statement 5270.11 (Nov. 23, 2016)). Indeed, the number of incarcerated

---

[20] Available at https://www.gao.gov/assets/gao-24-105737.pdf

persons with "serious mental illness" placed in SHUs between 2018 and 2022 remained relatively constant. *Id.* at 18.

> **ii. While living in the community on supervised release, Mr. Teekaye will have access to comprehensive services, and his compliance with treatment and restrictions on internet use and associations will be closely monitored.**

The conditions inside the BOP and the risks they present to Mr. Teekaye stand in stark contrast to the services that will be available to him while living in the community on supervised release. With input from Mr. Teekaye, the defense put together a release plan attached as Exhibit Q, which details resources that Mr. Teekaye can connect with upon his release from BOP custody. They include:

- Housing through a Residential Rehabilitation Program (RRP). RRPs provide housing and support services to individuals with serious mental illness with the goal of eventually transitioning to independent living. Schizophrenia is one of the Priority Population Diagnoses for RRPs. As he gets closer to release, and with help from the Federal Public Defender's office, Mr. Teekaye can apply for placement in an RRP.

- To ensure access to mental healthcare, and in addition to services available through the U.S. Probation Office, Mr. Teekaye should be eligible for Medicaid. If he is accepted into an RRP, his mental health treatment would be coordinated through that program. If he instead lives with his parents, Mr. Teekaye can connect with an Assertive Community Treatment (ACT) team through People Encouraging People (PEP). ACT teams provide mobile mental health services for individuals with persistent mental health needs who struggle with traditional outpatient services. ACT teams include program managers, a psychiatrist or psychiatric mental health nurse practitioner, nurses, therapists housing

specialists, vocational therapists, and peer specialists.[21] If Mr. Teekaye is not eligible for the ACT Team through PEP, he can nonetheless seek care through PEP's group practice that integrates psychiatric and therapy services, as well as the targeted case management program that helps to "coordinate care and connect clients to housing, healthcare, employment, and crisis services."

- In addition to vocational training offered through the U.S. Probation Office, Mr. Teekaye can look for employment through various resources that help formerly incarcerated people find jobs.

- Mr. Teekaye can attend the mosque where a former Jummah leader from CDF worships, the Gwynn Oak Islamic Community Masjid Al-Ihsan.

- Mr. Teekaye can pursue hobbies that interest him, including fishing (which he enjoyed doing with his father as a child), exercise, and caring for animals.

Exhibit Q (Plan for Re-entry and Community Support).

The rehabilitative impact of these services, and their import for public safety, will be buttressed by supervised release conditions that mitigate the risk that Michael will decompensate and reengage in risky and problematic behavior, particularly online behavior. Supervised release provides a measure of long-term assurance of public safety. Mr. Teekaye has agreed to a lifetime of supervised release. He further consents, and indeed recommends, all the conditions of supervision suggested by the U.S. Probation Office – including mandated mental health treatment, medication compliance, a prohibition against communicating and/or interacting with known members of foreign and domestic terrorist organizations, computer monitoring software, and initial and random searches of his computers and electronic devices. These conditions, taken

---

[21] Available at https://peponline.org/programs-services/

together, are significant. All of Mr. Teekaye's electronic communications will be monitored, he will be required to verify his participation in mental health treatment, and he will be required to verify his compliance with his medication regimen.

### B. The terrorism enhancement's one-size-fits-all approach is at odds with the individualized sentencing process mandated by § 3553(a).

The terrorism enhancement under § 3A1.4 is fundamentally at odds with the requirement that a defendant be sentenced according to their individual characteristics. The terrorism enhancement of the Sentencing Guidelines, U.S.S.G. § 3A1.4, is a blunt instrument and a draconian one: if "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism,"[22] the enhancement automatically increases a defendant's offense level by 12 levels (with a minimum of 32) and automatically places a defendant in Criminal History Category VI. U.S.S.G. § 3A1.4 (a), (b).[23] Unsurprisingly, this can have an immense influence on a defendant's Guidelines range and ultimate sentence.

Mr. Teekaye objects to the applicability of this enhancement, because his offense was not "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." If the Court disagrees, however, and finds that this "unequivocally severe" regime, *United States v. Benkahla*, 501 F. Supp. 2d 748, 751 (E.D. Va. 2007), applies in this case, then the enhancement nonetheless operates entirely "contrary to the theory behind the guidelines: that the offense level will reflect the seriousness of the offense, increasing incrementally based on specific aggravating facts, and the criminal history category

---

[22] The term "federal crime of terrorism," consists of two elements: (1) the commission of one of a list of specified felonies, and (2) a specific intent requirement, namely, that the underlying felony was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5); *United States v. Chandia*, 514 F.3d 365, 376 (4th Cir. 2008).

[23] Thus, at the very least, this results in a starting advisory sentencing guidelines range of 210-262 months.

will reflect the risk to the public, based on the defendant's prior record." *United States v. Dais*, 482 F. Supp. 3d 800, 803 (E.D. Wis. 2020). Indeed, the enhancement contravenes one of the fundamental tenets of our criminal justice system – that sentences should be "individualized and proportionate," distinguishing "between the worst offenders and those who are less dangerous." *Id.* Mr. Teekaye's sentence should be crafted to avoid a "'dramatically unreasonable'" result. *United States v. Stewart*, 590 F.3d 93, 147 (2d Cir. 2009) (quoting sentencing judge on the illogical severity of the enhancement).

The terrorism enhancement is fundamentally flawed in two respects.

### i.   First, the shift to the highest criminal history level is predicated on an insidious fiction of a recidivist, repeat offender who has failed to rehabilitate after being previously caught and punished.

[The enhancement] can, as it does in this case, import a fiction into the calculus. It would impute to a defendant who has had no criminal history a fictional history of the highest level of seriousness. It's one thing to adjust the offense level upward to signify the seriousness of the offense. *It is entirely another to say that a defendant has a history of criminal activity that he does not, in fact, have.*

*United States v. Mehanna*, No. 09-10017-AO (D. Mass. 2012), ECF No. 439 at 69-70 (emphasis added).

In effect, § 3A1.4 transforms the defendant into a career offender, even if they have minimal to no criminal history. *See id.* (contrasting the terrorism enhancement with the career offender guideline, which makes a similar adjustment, but does so "precisely because [a defendant] has a certain criminal history."); *Stewart*, 590 F.3d at 147 (defendant "'has no criminal history and yet is placed in the highest criminal history category equal to that of repeat felony offenders for the most serious offenses including murder and drug trafficking.'") (quoting sentencing judge).

Courts that have signed off on the enhancement's treatment of criminal history have done so by concluding, in effect, that the threat from 'terrorism' is so grave, and 'terrorists' are so resistant to rehabilitation, that "terrorists and their supporters should be incapacitated for a longer period of time." *United States v. Meskini*, 319 F.3d 88, 92 (2nd Cir 2003); *see also United States v. Jayyousi*, 657 F.3d 1085, 1117–19 (11th Cir. 2011); *United States v. Ressam*, 679 F.3d 1069, 1091 (9th Cir. 2012) (quoting *Jayyousi*, which quoted *Meskini*). But as one court has convincingly shown, such a belief is just that – a belief – unsupported by data and shown to be false. *United States v. Alhaggagi*, 372 F. Supp. 3d 1005, 10130-15 (N.D. Cal. 2019), *vacated and remanded on other grounds*, 978 F.3d 693 (9th Cir. 2020) ("There is no published statistical data demonstrating that defendants convicted of . . . anti-terrorism statutes . . . are any more likely to be recidivists than any other first offenders. Nothing in the history of U.S.S.G. section 3A1.4 would indicate that any reliable data was used to determine if a person convicted of a material support offense is more likely to be a recidivist.") (citations omitted); *United States v. Muhtorov*, 329 F. Supp. 3d 1289, 1302 (D. Colo. 2018) ("In the terrorism context, the basic problem with the Guidelines is the utter vacuity of empirical evidence or facts employed by the Sentencing Commission in forming them. In this respect, the Guidelines are the epitome of *ipse dixit*—'because the Commission says so.'").

The basis on which the Guidelines purport to rest – the reason § 3553(a) states that they are entitled to some careful consideration – is that they are supposed to be based on empirical evidence that the Commission considers in the exercise of its institutional role. When that is not the case, as with the terrorism enhancement, the rationale for deferring to the Guidelines disappears. *See Kimbrough,* 552 U.S. at 109 (authorizing district courts to disagree with, and vary from, Guidelines on policy grounds when a particular guideline "do[es] not exemplify the

Commission's exercise of its characteristic institutional role," i.e., the Commission did not take account of "empirical data and national experience" when formulating the guideline).

Section 3A1.4 appears to be "simply a way of 'cooking the books' to get to a score and a desired sentencing range." *Mehanna*, ECF No. 439 at 69-70. Of course, a "judge determining that § 3A1.4(b) over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' *always has the discretion under § 4A1.3 to depart downward in sentencing*." *Meskini*, 319 F.3d at 92 (emphasis added); *see also Benkahla*, 501 F. Supp. 2d at 759 ("Without any prohibition or limitation, it is clear that the Commission did not intend to restrict a court's discretion with respect to criminal history downward departure under § 3A1.4.").[24] And there is a growing chorus of courts decrying the intransigent severity of the enhancement – especially in cases, like this one, where the defendant is summarily whisked from category I to VI. These include cases with serious and dangerous conduct.

Take, for example, Judge Hazel of this Court in *United States v. Hasson*, No. 8:19-cr-00096 (D. Md.). Mr. Hasson pleaded guilty to violating 18 U.S.C. § 922(g)(3) by possessing firearms as someone "who is an unlawful user of or addicted to any controlled substance," in addition to two firearm-possession counts and one misdemeanor count of simple drug possession. But that case was about much more than a simple firearms conviction: the government alleged that Mr. Hasson, a distinguished Coast Guard officer, had been stockpiling

---

[24] This, of course, includes the discretion to vary downward as well under 18 U.S.C. § 3553(a). And recent amendments passed by the Sentencing Commission and set to go into effect on November 1, 2025, essentially replace departures in favor of variances. U.S.S.C. 2024–2025 Amendment Cycle Simplification Amendment.

weapons and planning domestic terror attacks, including targeting specific members of Congress, all in service of a white supremacist ideology. *See id.*, ECF 104.

At sentencing, the Court found § 3A1.4 applied. *Id.*, ECF 134 at 230-37. While agreeing that the enhancement properly increased Mr. Hasson's offense level, the Court balked at the concomitant increase in criminal history from category I to category VI. It departed downward, moving him back to Category I "for the fairly simple reason that that's his criminal history, *that the defendant has no criminal history*." *Id.* at 237 (emphasis added). "It simply doesn't make sense," the Court concluded, "that [the enhancement] should impact his criminal history category." *Id.*

The judge in the high-profile case of *United States v. Fox*, No. 1:20-cr-00183 (W.D. Mich.), in which the defendant was convicted of participating in a militia plot to kidnap the Governor of Michigan, ruled similarly, calling the enhancement a "very rough instrument." *Id.*, Sentencing Tr. at 28, ECF 851. The court disregarded § 3A1.4's criminal history enhancement because the court's task at sentencing is to determine "the overall seriousness of the wrongdoing and the overall seriousness of the offender's history, *because in the case of the terrorism enhancement the guidelines don't do the job*." *Id.* at 30 (emphasis added). In the end, the court found unwarranted a move up to category VI since the defendant's actual history "would, apart from the terrorism enhancement, be category I, the lowest criminal history because he doesn't have any." *Id.* at 28-29.[25]

In *United States v. Alhaggagi*, 372 F. Supp. 3d 1005 (N.D. Cal. 2019), a Yemeni-American man was convicted of attempted material support for ISIS for engaging in boisterous

---

[25] The defense did not object to the applicability of the enhancement but rather sought a variance. *Id.* at 6.

talk on ISIS chatrooms, bragging to an undercover source, and being provided with fake explosives before backing off any further action. The district court applied the terrorism enhancement, but with serious reservations, noting that it "takes a wrecking ball to th[e] carefully constructed edifice [of the Sentencing Guidelines.]" *Id.* at 1013 (citing George D. Brown, *Punishing Terrorists: Congress, the Sentencing Commission, the Guidelines, and the Courts*, 23 Cornell J.L. & Pub. Pol'y 517, 520 (2014)). The enhancement's 12-level increase, the court noted, is no doubt based on the notion that '"terrorism" is a serious crime. But a "defendant's *criminal history category* reflects something different." *Id.* (emphasis in original). "Automatically increasing a defendant's criminal history to reflect the seriousness of the charged offense is inappropriate, as it does not reflect—unlike every other offense—the seriousness of the defendant's previous criminal convictions." *Id.* The court therefore departed back to criminal history category I. *Id.*

It would be "illogical and unjust," *Alhaggagi*, 372 F. Supp. 3d at 1016, to place Mr. Teekaye's criminal history in category VI rather than category I. Indeed, as the Fourth Circuit reminds us, a "departure pursuant to § 4A1.3 is *encouraged*, provided that the criminal history category does not account adequately for the defendant's past criminal conduct or the likelihood that he will commit other crimes." *United States v. Dixon,* 318 F.3d 585, 588 (4th Cir. 2003) (emphasis added). That is the case here: Mr. Teekaye naturally falls into category I, the lowest criminal history category, such that category VI clearly overrepresents the seriousness of his criminal record.

> ii. **Second, the same force of logic applies to the problems with the enhancement's increase of offense level just as much as with criminal history.**

Section 3A1.4 prescribes a one-size-fits-all approach, mandating a twelve-level increase in all terrorism cases, regardless of how blameworthy a particular defendant is. Few provisions in the Guidelines call for such an enormous enhancement; increasing a defendant's offense level so dramatically is fundamentally inconsistent with the theory underlying the Guidelines, which generally gradate punishment incrementally to reflect marginal increases in culpability. *See, e.g.*, U.S.S.G. § 2D1.1(c) (providing escalating base offense levels – from 6 to 38 – that increase gradually as the quantity of drugs involved in an offense increases), and U.S.S.G. § 2B1.1(b)(1) (providing a series of escalating offense levels in financial crimes based on the monetary loss by victims).

But courts have also pushed back against this undifferentiation in crafting sentences unique to the defendants in front of them. As the *Fox* court reminded, "We have to calibrate as judges the overall seriousness of the wrongdoing […] because in the case of the terrorism enhancement the guidelines don't do the job." *Fox*, Sentencing Tr. at 30, ECF 851. That court fully acknowledged the "incredibly serious" nature of the defendant's crime – conspiring to kidnap a government official – one that has an "impact on our overall governmental system." *Id.* at 29. Even then, after considering the specific offense conduct (including what was intended and what in fact happened) and the defendant's characteristics, the court varied downward from a Guidelines range of life and sentenced the defendant to 192 months. *Id.* at 40.

The same is true in the case of a domestic eco-terrorist who set off a bomb and burned down a research facility at Michigan State University. *United States v. Mason*, No. 1:08-cr-00047 (W.D. Mich.). That case, the judge noted, was "not about a prosecution for holding political viewpoints. […] [The] case is about an abandonment of the marketplace of ideas in favor of reckless criminal activity where intimidation and fear replace persuasion and dialogue."

*Id.*, Sentencing Tr. at 102, ECF 201. Again, even so, the court found the full 12-level increase to offense level inappropriate because "the enhancement is without gradation." *Id.* at 103. The court therefore limited the increase to eight offense levels. *Id.*

Similarly, the sentencing court in *United States v. Garey*, 383 F. Supp. 2d 1374 (M.D. Ga. 2005), *aff'd,* 546 F.3d 1359 (11th Cir. 2008), varied downward from the Guidelines range of life in a case in which the defendant was convicted of threatening to bomb various buildings in and around Macon, Georgia. The court acknowledged "the wisdom in the policy underlying the Sentencing Guidelines provision that increases a defendant's sentence when the defendant's offense is intended to affect the conduct of government by intimidation or coercion." *Id.* at 1380. But it nevertheless found "a twelve level increase, which represents approximately twenty-five percent of the total offense level, to be excessive." *Id.* at 1380. This was, in part, because the Count was troubled that "another defendant who carried out a threat to bomb public facilities, injuring and maiming (but not killing) thousands of people, would face the same sentence as this Defendant who did not cause physical injury to a single person" and would not "accomplish the purposes set forth in 18 U.S.C. § 3553." *Id.* at 1379. Instead, the court decided that a more reasonable adjustment to the offense level would be a six-level increase—comparable to the greatest adjustment permitted when the victim of an offense is an "official victim" under U.S.S.G. § 3A1.2. *Id.*

> Simply put, the terrorism enhancement flies in the face of fair, individualized sentencing, and is inappropriate as to this Defendant. The presumption under U.S.S.G. section 3A1.4 is incompatible with 18 U.S.C. § 3553, which requires that a defendant be evaluated individually to justify his or her sentence.

*Alhaggagi*, 372 F. Supp. at 1015 (internal quotations omitted).

Due consideration of the § 3553(a) factors as they apply to Mr. Teekaye supports the defense's recommendation for a sentence of 5 years' imprisonment to be followed by a lifetime

of supervision with conditions that are tailored to address Mr. Teekaye's history, characteristics, and treatment needs.

### III. The Court should include recommendations in the Judgment and Commitment Order regarding Mr. Teekaye's designation to a facility that is better equipped to provide him with mental health care.

Mr. Teekaye asks the Court to include the following recommendations in the Judgment and Commitment Order:

> The Court strongly recommends the initial designation to be a Federal Medical Center. If the BOP cannot comply with the recommendation, then FCI Petersburg is recommended or the Skills program at either FCI Coleman or FCI Danbury. If the BOP cannot comply with any of the Court recommendations, the Court requests a written response with the reason for non-compliance. The Court also recommends Federal Prison Industries (FPI UNICOR) and participation in a Department of Labor vocational training apprenticeship program.

### IV. Conclusion

Mr. Teekaye has a complicated history. He engaged in serious conduct, but he has shown insight into his mental health needs and will be well-positioned to lead a productive and meaningful life with appropriate supports. A sentence of 5 years' imprisonment, followed by a lifetime term of supervised release with appropriate conditions is sufficient but not greater than necessary to achieve the purposes of sentencing.

Respectfully submitted,

/s/
Courtney D. Francik
Assistant Federal Public Defender
Office of the Federal Public Defender
    For the District of Maryland
100 South Charles Street
Tower 2, Floor 9
Baltimore, Maryland 21202
Courtney_Francik@fd.org

53